383 So.2d 969 (1980)
ACTION FIRE SAFETY EQUIPMENT, INC., et al., Appellants,
v.
BISCAYNE FIRE EQUIPMENT COMPANY, INC., Appellee.
No. 79-946.
District Court of Appeal of Florida, Third District.
May 27, 1980.
*970 Horton, Perse & Ginsberg and Arnold Ginsberg, Miami, Weinstein & Mandell, South Miami, for appellants.
Headley & Headley, Daniels & Hicks and Sam Daniels, Miami, for appellee.
Before SCHWARTZ and DANIEL PEARSON, JJ., and VANN, HAROLD (Ret.), Associate Judge.
DANIEL PEARSON, Judge.
Biscayne Fire Equipment Company (Biscayne) sued to enforce a written covenant not to compete which it alleged had been executed and breached by its former general manager, Frank Falsetti.[1] The jury returned a verdict in favor of Biscayne.[2] The trial court entered a judgment enjoining Falsetti and a company formed and owned by Falsetti, Action Fire Safety Equipment, Inc. (Action), from competing with Biscayne within a forty-five mile radius for a period of two years and ten months.[3]
The dispute at trial centered on whether Falsetti had entered into an agreement not to compete with Biscayne in the event he left Biscayne's employment. Falsetti denied executing any such agreement, *971 and no agreement between him and Biscayne could be found. However, Biscayne established through the testimony of its owner, Dallas Chrans, that: (a) for many years it experienced the problem of service personnel, trained at substantial cost by Biscayne, joining competing companies and making their new start in life with Biscayne's customer lists; (b) to overcome this problem Biscayne, beginning in 1971, required every employee, including Falsetti, to sign an identical agreement containing this covenant not to compete; (c) he saw Falsetti sign this agreement; (d) these signed agreements were kept by Falsetti in his office, but after Falsetti left in May 1977 to form Action, the agreement could not be found despite an exhaustive search; (e) several months after Falsetti left one of these agreements (signed by an ex-employee named O'Neil and hereafter called the O'Neil agreement) was discovered lodged in the back of a file drawer.
The attorney who at Chrans' request prepared the prototype employment agreement identified the O'Neil agreement as an exact copy of the one he prepared.[4] Fred Blackwell, a Biscayne employee, corroborated Chrans' testimony that there was only one agreement (identical to the O'Neil agreement) signed by all employees and testified that he witnessed Falsetti's signature on this agreement.
Falsetti and Action contend that the O'Neil agreement was inadmissible to prove the contents of Falsetti's agreement with Biscayne. We disagree. The testimony elicited by Biscayne adequately established that the original was under the control of Falsetti, the party against whom the secondary evidence was being offered. It also showed that an extensive but unsuccessful search for the Falsetti agreement was made. Lastly, Falsetti was on notice of Biscayne's intention to use the O'Neil agreement to prove Falsetti's agreement.[5] Given these predicates, it was well within the trial court's discretion to admit secondary evidence to prove the contents of the Falsetti agreement.[6]See Pennsylvania National Mutual Casualty Insurance v. Burns, 375 So.2d 302 (Fla. 2d DCA 1979); Goldstein v. Klein, 287 So.2d 390 (Fla. 3d DCA 1974); Development Corporation of America v. United Bonding Insurance Company, 413 F.2d 823 (5th Cir.1969); Western, Inc. v. United States, 234 F.2d 211 (8th Cir.1956).
This conclusion does not, however, dispose of Falsetti's further claim that even if a sufficient foundation for the admission of secondary evidence were laid, the best available secondary evidence was not the O'Neil agreement, but parol evidence of the contents of the Falsetti agreement. We cannot agree that a witness's recollection of the words of a contract is better secondary evidence than an exact replica of the contract itself.[7] Oral testimony purporting to relate the contents of a writing is the least trustworthy evidence of its contents. McCormick, Evidence § 241 (2d ed. 1972); 4 Wigmore, Evidence §§ 1266, 1268 (Chadbourn *972 rev. 1972). Additionally, the admission of identical but other agreements as secondary evidence was specifically upheld in Fields v. Fields, 140 Fla. 269, 191 So. 512 (1939). In Fields, the plaintiff brought suit on a note which, she established, was previously destroyed by fire. To show the contents of the destroyed original and thus to prove that her note was under seal,
"... the attorney who represented Mrs. Fields, claimant, in her divorce action testified as to the form of notes he used in his practice, such forms being the same as those prepared and used by the Ft. Pierce Bank and Trust Company. Two employees of that bank testified as to the form of the notes used, by the bank both saying the notes had `seal' on them. A copy of each form of note was introduced into evidence as Plaintiff's Exhibits `F' and `G'." 191 So. at 513.
We turn now to an examination of Falsetti's second point on appeal. He contends that the trial court erred in failing to grant him a new trial grounded on newly discovered evidence. The new evidence which Falsetti suggests would have probably changed the result of the trial was the proposed testimony of Marion Einhorn, a Biscayne employee who was under Biscayne's subpoena but was not called as a trial witness. Einhorn's post-trial affidavit stated in pertinent part:
"... Before trial Mr. Chranz talked to me about my testimony. He told me to answer the questions yes or no and not to go into long explanations. He said:
"`If you do not know the answer and if I am looking up the answer is yes, and if I am looking down the answer is no.'
"After the trial was over Fred Blackwell, my supervisor, told me that when he testified during the trial, he lied for Mr. Chranz. He told me he said to Mr. Chran z `I testified, I lied for you in Court, and I don't know why.'"
Biscayne countered Falsetti's motion for new trial with an affidavit made by Fred Blackwell which denied the statements attributed to him by Einhorn and reaffirmed the truth of his trial testimony.
The trial court denied the motion, stating:
"I am going to first order that the State Attorney's Office be given a copy of the deposition, and to give me a report on their conclusions. That is number one. I take unkindly to anybody that would come in and permit perjury in court. I think even for the person to come in and kid about it later, certainly would not be using good taste.
"However, I am not sure what the jury would do. I do not know what would have went on in the minds of the jurors had they known that this was true. Frankly, I looked at Mr. Blackwell, and frankly in listening to the case, did not put a whole lot of reliance on what he said. He is under the gun. He has a job and he is scared to death of his job, and I admire this lady who apparently does not have that kind of feeling. I did not put any reliance upon what Mr. Blackwell said, but I will tell you that I put the greatest reliance on the fact that I agreed with the jury's verdict  that it was basic common sense  that here is a man who has got a business and who wants to protect his business by having all the employees sign a non-competitive agreement ...
"I just cannot conceive that it would be true that they did have such an agreement and that they are all now missing all those agreements that were in the hands of the defendant. It does not speak well of the nature of the operation. It just defies imagination to say that they would not have such an important man not sign it. I did not hear any explanation that was satisfactory to the court, at least as to why it did not happen, and I am going to allow the injunction to stand." (R. 349-351).
A motion for new trial is directed to the sound discretion of the trial court, and its decision will not be overturned in the absence of a showing that it abused its discretion. Cloud v. Fallis, 110 So.2d 669 (Fla. 1949). We, however, cannot review the trial court's exercise of discretion when the *973 record before us fails to reflect that it was exercised within the law's parameters. The parameters are these: Would the new evidence probably change the result if a new trial is granted? Has it been discovered since the trial? Could it have been discovered before the trial by the exercise of due diligence? Is it material to the issues? Is it merely cumulative or impeaching?[8]See City of Winter Haven v. Tuttle/White Constructors, Inc., 370 So.2d 829 (Fla. 2d DCA 1979); Dade National Bank of Miami v. Kay, 131 So.2d 24 (Fla. 3d DCA 1961). We discern from the record before us that the trial court accepted Einhorn's testimony as true. We cannot discern whether the trial court concluded that Einhorn's testimony was not such as would probably have changed the jury's verdict.[9] All that the record shows is that the trial judge concluded that he agreed with the jury's verdict and that he did not heavily rely on Blackwell's testimony in coming to that conclusion. The trial court simply did not address, which he must, the issue of whether Einhorn's testimony if heard by the jury probably would have changed the jury's verdict. For this reason we vacate the order of the trial court denying the defendant's motion for new trial and remand the cause to the trial court to reconsider that motion in light of this opinion. If, after reconsideration, the trial court determines to deny the motion for new trial, then the judgment entered upon the jury's verdict, because of our view that no reversible error was committed by the admission of the O'Neil agreement, shall remain unaffected.
Reversed and remanded.
NOTES
[1] Biscayne's business was to sell and service both portable fire extinguishers and fixed installation fire protection systems.
[2] The special verdict established that there was an agreement by Falsetti not to compete and that Falsetti breached this agreement.
[3] The agreement containing the non-competition covenant called for no competition for three years. Before the final judgment Falsetti and his company, Action, had been temporarily enjoined for two months.
[4] The single agreement prepared by the attorney left blanks for the insertion of the employee's name and salary, the date, and signatures.
[5] Biscayne's amended complaint attached the O'Neil agreement as representing the exact agreement it contended Falsetti signed. The complaint itself may constitute a sufficient implied notice that the pleader is charging the adversary with possession of the original and that he considers its production essential. McCormick, Evidence § 239 (2d ed. 1972), at 573. At a later stage of the pretrial proceedings, Biscayne advised Falsetti through answers to interrogatories that it did not have the signed Falsetti agreement, that it was last seen in Falsetti's custody and that it disappeared when Falsetti left its employ.
[6] In the present case secondary evidence was admissible on the alternative grounds that the original was lost or that it was last under the control of Falsetti.
[7] The present case was tried in March 1979, prior to the effective date of the Florida Evidence Code, Section 90.101, Florida Statutes (1979) et seq. Under Section 90.103(2), the Florida Evidence Code applies to civil actions accruing after the effective date. The Code adopts the better view that once a predicate for secondary evidence is laid, no distinction should be made between forms of secondary evidence. Significantly, the term other evidence, not secondary evidence, is used in the Florida Evidence Code. See § 90.954, Fla. Stat.
[8] Biscayne's argument is simply that the new evidence probably would not have changed the jury's verdict and was merely cumulative.
[9] The trial court may have also concluded that Einhorn's testimony was merely cumulative or impeaching. Falsetti had testified at trial that Blackwell had told him that everybody, including Blackwell, who was going to testify for Biscayne, was going to lie and that Blackwell was specifically going to lie by stating Falsetti had a contract with Biscayne. Another former Biscayne employee testifying for Falsetti related that Chrans said he would do "whatever it takes" and spend "whatever amount of money it takes" to put Falsetti out of business. Indeed, Blackwell admitted receiving from Chrans a $15,000 bonus and an additional bonus after the lawsuit had begun.