698 So.2d 267 (1997)
E.I. DU PONT DE NEMOURS AND COMPANY, etc., Appellant,
v.
NATIVE HAMMOCK NURSERY, INC., Appellee.
No. 95-1656.
District Court of Appeal of Florida, Third District.
May 7, 1997.
Rehearing Denied August 20, 1997.
*268 Popham, Haik, Schnobrich & Kaufman and Wendy F. Lumish and Clinton R. Losego, Miami, for appellant.
Fowler, White, Burnett, Hurley, Banick & Strickroot and John R. Kelso, Miami, for appellee.
Before NESBITT, GODERICH and SORONDO, JJ.
NESBITT, Judge.
E.I. DuPont De Nemours and Company appeals an order awarding plaintiff below, Native Hammock Nursery, Inc., a new trial. We reverse the order under review.

THE FACTS
At issue in the five month trial below was whether Benlate, a fungicide manufactured and sold by DuPont, was defective and, if so, whether this defect was a proximate cause of damage at five unrelated nurseries, including Native Hammock. (The instant action is between DuPont and Native Hammock only.) At trial, Native Hammock argued that its plants had become sickly shortly after it had begun using Benlate. DuPont responded that the plants' deterioration could have been caused by a number of factors unrelated to Benlate including an unusual freeze which occurred during the time period at issue, Hurricane Andrew, or "cultural problems," i.e., certain practices followed by local growers. DuPont also maintained that the damage allegedly observed in certain plants designated to go to the Department of Transportation (DOT), was the result of DOT not having taken timely delivery of those plants. The nursery alleged several theories for its loss including the claim that the damage was the result of sulfonylurea contaminants (SUs) found in Benlate. The jury ultimately returned a verdict in DuPont's favor and the trial judge entered final judgment accordingly.
Post-trial, Native Hammock filed a motion pursuant to Rules of Civil Procedure 1.530, 1.540, and 1.480 for new trial, relief from judgment, and directed verdict. Therein, the nursery argued a number of factors warranting a new trial, including the release of Florida Department of Agriculture testing results indicating the presence of SUs in Benlate, as well as the occurrence of certain inappropriate behavior by one of DuPont's experts at trial. While that motion was still pending, the nursery filed two subsequent memoranda claiming as additional grounds, evidence in an unrelated pending case indicating the presence of SUs in soil samples submitted by certain out of state growers who used Benlate.
The trial court here ultimately entered the order under review, incorporating and adopting the nursery's original motion and subsequent memoranda. The trial judge grounded his ruling on the previously unadmitted Florida Department of Agriculture testing results, the discovery of SUs in the soil of other growers, and the inappropriate behavior of a DuPont expert at trial.

THE LAW
A motion for new trial is directed to the sound discretion of the trial court, and its *269 decision will not be overturned in the absence of a showing that it abused its discretion. Cloud v. Fallis, 110 So.2d 669 (Fla. 1959). However the trial court must exercise its discretion within the parameters of the law. Those parameters are: Would the new evidence probably change the result if a new trial is granted? Has it been discovered since the trial? Could it have been discovered before the trial by the exercise of due diligence? Is it material to the issues? Is it merely cumulative or impeaching? Action Fire Safety Equip., Inc. v. Biscayne Fire Equip. Co., 383 So.2d 969 (Fla. 3d DCA 1980); see City of Winter Haven v. Tuttle/White Constructors, Inc., 370 So.2d 829 (Fla. 2d DCA 1979); Dade National Bank of Miami v. Kay, 131 So.2d 24 (Fla. 3d DCA 1961). Material evidence is evidence which is relevant and goes to the substantial matters in dispute, or has a legitimate and effective influence or bearing on the decision of the case. City of Winter Haven, 370 So.2d at 830. Considering the above stated parameters, we conclude that the order under review, granting plaintiffs below a new trial, must be reversed.

THE DEPARTMENT OF AGRICULTURE TEST RESULTS
A number of experts testified for the nursery, including Dr. Martha Roberts, a scientist and Deputy Commissioner of the Florida Department of Agriculture and Consumer Services. Not admitted into evidence, however, were the results of certain department tests released after the trial court's discovery cut-off date. In the order granting a new trial, the trial judge concluded that these test results constituted newly discovered evidence. We disagree.
Dr. Roberts was called as the nursery's first witness. After DuPont rested, the nursery, on rebuttal, recalled her to the stand and attempted to introduce her testimony as to the Department of Agriculture testing. When an objection was interposed, a proffer was made in open court outside the jury's presence and the following colloquy between the witness, respective counsel and the court ensued:
PLAINTIFFS' COUNSEL: ... We're going to introduce evidence of tests that were completed prior to the close of discovery in this case [October 22, 1993], that they [DuPont] chose not to depose. They didn't depose Dr. Roberts or Commissioner Crawford [the agricultural commissioner of Florida] although they were on my witness list.
THE COURT: So you're not going to bring up any of the tests that were done after the close of discovery?
PLAINTIFFS' COUNSEL: No, your Honor. I'm going to introduce evidence as to the findings that we had prior to October 22, 1993. That will be my question.
THE COURT: This isn't after-the-fact evidence according to the plaintiff.
PLAINTIFFS' COUNSEL: I'm going to ask the question so there can't be any doubt. What did you know of October 22, 1993?
DR. ROBERTS: Judge, if we had been asked questions regarding Sulfonylureas prior to that time, we would have indicated Judge we have measured the quantities of londax [another SU] but we would have testified. It is all right to say subsequent to October 22 because that is how I have to properly answer your question.
THE COURT: In other words, if a subpoena had been issued by this court for DuPont's lawyers to go up and take your deposition on October 22, 1993, would you have answered truthfully if these questions were asked of you?
DR. ROBERTS: Absolutely, I would have answered that we had measured quantities of what we had identified as Londax in 8 lots but that we had not totally confirmed or validated the method. We would have also testified about our other work on DBU.
[T]his was not secretive research and you [defense counsel] could have walked into the laboratory at any time as a member of the public and had this available to you.
The substance of the above testimony was ultimately excluded by the trial court on objection of defense counsel, who claimed a discovery violation pursuant to Binger v. *270 King Pest Control, 401 So.2d 1310 (Fla.1981). From the proffer, however, it is clear that the doctor was available and willing to talk about the department testing, if asked the appropriate questions. Equally clear from the above quoted language is that the nursery was or could have been well aware of the department tests in progress and, for reasons unknown to us, other than to suppose she was held back from testifying because of the potential beneficial effect of such testimony on rebuttal, Dr. Roberts was not asked about the testing on direct examination. Clearly then, the department tests could not constitute newly discovered evidence.
The nursery attempts to support the order under review by arguing that without the final test results, completed after the discovery cut-off date in this case, there was no way for the nursery to establish to the satisfaction of a jury that DuPont's experts might be wrong. The final test results, however, cannot form the basis for granting a new trial because subsequent agency action invalidates the announced results.
The trial judge granted the motion for a new trial when presented with the initial releases from the department, reporting the discovery of SUs in Benlate. Shortly thereafter, however, the department instituted an action against DuPont for misbranding, mislabeling and sundry other statutory violations. DuPont has supplemented the present record by an authenticated order entered by the Acting Commissioner of the Florida Department of Agriculture which upholds a hearing officer's recommendations that the department's administrative complaint be dismissed. The acting commissioner's order explicitly adopts the hearing officer's recommended finding that the original department study employed invalid scientific methodology.
In sum, considering the nursery's lack of due diligence in discovering and presenting the information at issue, and considering the test results at issue have since been rejected by the department itself, this testing cannot form the legal basis for granting a new trial.

OTHER GROWER'S SOIL TESTS
The trial court order awarding a new trial also provided:
Similarly, plaintiff produced newly discovered evidence that tests of "soil" of other growers (as opposed to the above-mentioned testing of Benlate) conducted by defendant have established that the soil of the growers contained Sulfonylurea herbicide. The information and test were set forth in the nursery supplemental memo at law served May 1, 1995 and the court incorporates by reference those facts, data and cases cited therein. (Emphasis added).
The information contained in the referenced supplemental memo incorporated evidence and argument in a pending Georgia case. The final order in that Georgia case was not released until four months after the order here under review. See In re E.I. du Pont de Nemours and Company-Benlate Litigation, 918 F.Supp. 1524 (M.D.Ga.1995)(referred to as "Bush Ranch I").
The trial judge granted Native Hammock's motion for new trial on May 9, 1995. The decision in Bush Ranch I was entered August 21, 1995, and that opinion was reversed in In re E.I. DuPont De Nemours & Company-Benlate Litigation (Bush Ranch II), 99 F.3d 363 (11th Cir.1996) in December 1996. Thus, the nursery here asks us to consider a case not before the trial judge when she decided to grant the nursery's motion. This we cannot do. As observed in Thornber v. City of Ft. Walton Beach, 534 So.2d 754 (Fla. 1st DCA 1988), appellate review is confined to the record on appeal. Sheldon v. Tiernan, 147 So.2d 593 (Fla. 2d DCA 1962); Permenter v. Bank of Green Cove Springs, 136 So.2d 377 (Fla. 1st DCA 1962). An appeal is not an evidentiary proceeding. Altchiler v. State, Dept. Of Prof. Reg., 442 So.2d 349, 350 (Fla. 1st DCA 1983). Furthermore, the judgment that was finally entered was subsequently vacated. Where a judgment is vacated or set aside, it is as though no judgment had ever been entered. See Shields v. Flinn, 528 So.2d 967, 968 (Fla. 3d DCA 1988).
Moreover, even if we were permitted to rely on Bush Ranch I, and in turn, the *271 discovery of SUs in the soil of other growers, we can only conclude that such test results were not sufficiently linked to the instant facts to form the basis for granting a new trial. There was simply no evidence tieing what the nursery alleged, to what happened in Alabama, Georgia, and Hawaii, the states involved in Bush Ranch I. Thus, the test results at issue were not the type of new, material evidence upon which the trial judge could find a legal basis for granting a new trial.
Also, the possibility of SUs in the soil of other growers was or could have been known and discussed at trial. The nursery offered an expert, Dr. Jodie Johnson, who clearly testified that the ALTA Lab's tests of other growers' soil, the same tests referred to in Bush Ranch I, revealed the presence of SUs. The following colloquy was elicited by the nursery's counsel with Dr. Johnson:
Q: An SU can be tested in the soil?
A: Sure, they can. Actually, some evidence there was some found
A: Soils can be analyzed. There has been evidence of some that might have been found.
Q: Have you looked at that data?
A: Yes.
Q: To determine whether SUs have been found in sample of soils of other growers?
A: Yes, I have. Not from the growers. I looked at one from ALTA labs. They have ALTA Labs in El Dorado Hills, California.
Thus, the nursery's counsel having walked directly into this revelation, utterly failed to develop it. It never came up again until the nursery's counsel submitted their supplemental memo referring to evidence being presented in Bush Ranch I.
Finally, on this issue, we are especially troubled by the nursery's argument that not only should we consider the test results outlined in Bush Ranch I, but we should keep in mind the trial judge's conclusion therein, that DuPont manipulated evidence. Again, that conclusion was never before the trial judge considering the nursery's claim, and again, a reversed opinion cannot support such a determination. However, even if we assume that the trial judge in Bush Ranch I was correct, it reveals nothing about DuPont's conduct in the instant case.
The nursery argues that DuPont masked its efforts to maintain an advantage through false testimony. However, nowhere in this record are we pointed to proof of fabrication, misrepresentation, or manipulation, nor was the order granting a new trial based on such a finding. If DuPont, its agents, servants and employees manipulated the lab results of the soil of other growers in other regions of the country and are ultimately held accountable, well enough. However, fundamental concepts of due process require that without sufficient foundation, DuPont will not have that behavior visited upon it here.
Again, what was before the trial court was only evidence in a pending case, the evidence at issue could have been discovered at trial with due diligence, the evidence at issue was not demonstrated to be material to the instant dispute, and the case from which the evidence was obtained, having been reversed, provides no support for the matter at issue.

INTIMIDATION OF THE NURSERY'S EXPERT
When the nursery called its expert Dr. Raymond Schneider to challenge DuPont's scientific investigation, Dr. Schneider gave his opinion that the field tests DuPont employed were done using an unacceptable scientific procedure and that the DuPont tests misrepresented the truth. Shortly after DuPont's counsel began cross-examination, following a midday break, the nursery's counsel advised the court that one of DuPont's witnesses, Dr. Timothy O'Brigawitch, had "threatened" Dr. Schneider. On the trial court's inquiry, defense counsel explained:
I had Dr. O'Brigawitch come over at lunchtime to go over some data outside the presence of the jury ... Dr. O'Brigawitch outside passed Dr. Schneider, and they know each other because they sat in on each other's depositions before. I talked to Dr. O'Brigawitch. He says he did not say one word to Dr. Schneider. All he did was razz him and go like this [indicating with his finger across his neck].
*272 The court then inquired of Dr. Schneider, who interpreted the incident from his perspective stating:
I laughed out loud. Everyone in the lobby heard me at the time. I said, "Wait a minute, this guy just threatened my life." This guy goes beyond DuPont, your Honor. This goes beyond the courtroom. This man threatened my life. What about my family at home now? People have been killed for a lot less than that.
....
What do I do now? Do I get a gun? Sir, the point is the rules of civility are off. What am I supposed to do now? When I go out not to mention his name or any of these guys' names? I mean they lie. It's unbelievable and this guy threatened my life. How am I supposed to be objective in testimony?
Out of the jury's hearing, the judge inquired of Dr. O'Brigawitch who indicated the gesture was not made to intimidate or threaten. He admitted it was done in response to what Dr. Schneider had said about DuPont test results misrepresenting the truth. The nursery's counsel asked the court to preclude the defense from continued cross-examination of the expert. The trial judge denied that request. The judge offered to adjourn in order to give the expert time to compose himself, however the nursery's counsel opted to have the case immediately proceed. During the cross-examination which followed, defense counsel elicited the following testimony from Dr. Schneider:
My testimony is that the experiment is invalidated because plants are missing ... We can't rely on that data.
In essence that DuPont relied upon to say that Benlate does not cause the damage is a result of this poor experimental design ...
....
... I'm wondering about the contradiction then between Dr. O'Brigawitch's later statement and Dr. Hadley's statement that diseases were not a factor in the conduct of those experiments, and how Dr. O'Brigawitch says that most of these were killed by phytophathora.
Q: In fact, you said you felt the entries in the small ag file pages, that the experiment was invalid because the entries weren't the same, it was misleading and so on and so forth, right?
A: It doesn't invalidate the experiment, it invalidates the analysis and these data relied upon.
Q: But I remember you used someyou really felt strongly about this, didn't you?
A: Oh, yes, absolutely ... The field test was defectively designed.
When cross-examination concluded, the trial court asked Dr. Schneider whether his testimony had changed as a result of the "throat slitting" insinuation. He replied:
I don't know. I really can't answer that. Here on the witness stand I answered the way I think I would have but now I don't know. I can't say. Certainly it's been on my mind. Every time I mention Dr. O'Brigawitch's name orunfortunately, Dr.let me put it this way, I have done an effective evaluation of the 1992 field testing.
Unfortunately, Dr. O'Brigawitch is the experimenter and his name has to come up. He takes responsibilitythe DuPont lawyers for the science that was done so if I'm required to evaluate that information, I have to mention his name. When I do I can't help but think what happened and what might happen some months or a year from now.
That's what's on my mind. What goes on after this day is over.
At no time did the nursery request a mistrial, even after Dr. Schneider had fully completed his testimony and the trial court had made further inquiries.
We must assume that all trial attorneys are responsible for their conduct. At stake here was a months long trial and a multimillion dollar claim. Ultimately, the trial court's award of a new trial was grounded in part upon this misconduct. The gesture at issue was certainly socially unacceptable and highly unprofessional. However, as we have recited in full all that transpired, we cannot approve the trial court's decision. For lack of the request for what the nursery now *273 argues is necessary relief, after five months of testimony, we find this ground for a new trial to be makeweight to the point of being farcical.

CONCLUSION
The "new" evidence upon which a new trial was granted was either evidence known at trial, evidence that with due diligence could have been discovered at trial, or evidence that for some other reason could not form the legal basis for granting a new trial. This court does not sanction fraud either in the abstract or in reality nor do we condone evidentiary fabrication, tampering, or manipulation. By the same token, we cannot approve insinuation or innuendo or for a claim of fraud to be visited on a party without there being a showing that such fraud occurred in this case or that the results in other cases affected the instant case. For the reasons cited herein, we reverse the order granting a new trial.
Accordingly, the order is vacated with directions to reinstate the original final judgment.